1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10              WESTERN DIVISION
11

12  ANGELA LOCKHART et al., on          CV 07-1680 ABC (CWx)
    behalf of themselves and all
13  others similarly situated,          ORDER RE: DEFENDANTS' MOTION TO
                                        DECERTIFY COLLECTIVE ACTION
14                  Plaintiffs,

15

16          v.

17  COUNTY OF LOS ANGELES, and LEE
18  BACA, et al.,

19                  Defendants.

20

21      Pending before the Court is Defendants County of Los Angeles, et

22  al.'s ("Defendants" or "County") Motion to Decertify Collective Action

23  ("Motion"), filed on June 4, 2012.  Plaintiffs Angela Lockhart, et

24  al., filed an Opposition on July 17, 2012 and Defendants filed a Reply

25  on July 20, 2012.  Defendants also submitted Appendices of Evidence

26  consisting of Exhibits 1 through 86.  The Court heard oral argument on

27  August 6, 2012.  For the reasons below, the Court **GRANTS** Defendants'

28  Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In this lawsuit, Plaintiffs, deputy sheriffs employed by the Los Angeles County Sheriff's Department ("LASD"), claim that Defendants failed to compensate them for various pre-shift and post-shift activities in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*.  These activities can be divided into two categories: (1) donning and doffing uniforms and related equipment, and (2) all other "off-the-clock" activities, such as participating in "pass-on" briefs by deputies going off-shift, preparing and inspecting patrol cars and equipment, attending briefing, checking in, checking email, completing paperwork, completing late arrests, doing security checks of courtrooms and jails, and a number of other tasks.  The parties and the Court have referred to the resulting claims as donning and doffing claims and off-the-clock ("OTC") claims, respectively.

On July 14, 2008, pursuant to the "two-step analysis" governing collective action certification, the Court found that Plaintiffs made the threshold showing that the potential members of the §216(b) collective action were "similarly situated" to the named Plaintiffs and conditionally certified the donning and doffing and OTC claims. Since then, approximately 195 persons have opted-in to this action.

On June 14, 2012, the Court granted summary judgment for Defendants against Plaintiffs' donning and doffing claim.  As such, the only remaining conditionally certified claims are Plaintiffs' off-the-clock claims.

Defendants now ask the Court to undertake the more stringent second step of the certification analysis and decertify this action. Defendants contend that discovery obtained to date shows that Plaintiffs' OTC claims are too disparate to lend themselves to

resolution in a collective action.  Defendants submitted extensive evidence to support their motion, including 86 exhibits consisting of declarations, deposition testimony, and discovery materials.

Plaintiffs' Opposition does not engage either the arguments or the evidence that Defendants presented in their moving papers, and Plaintiffs presented no evidence of their own.

Defendants filed the same Motion to Decertify in related case *Ascolese v. County of Los Angeles*, CV 08-1267 ABC (CWx), supported with substantially the same evidence presented here.  The *Ascolese* Plaintiffs, however, submitted an Opposition that, although not extensive, was nevertheless more substantial than the Opposition these Plaintiffs filed.  In an Order issued concurrently with this one, the Court addressed the merits of decertification, and granted the Motion. Because the substantive arguments for both this case and *Ascolese* are the same, the Court incorporates herein by reference the entirety of the *Ascolese* Order; that Order is appended hereto as Attachment 1.

In this Order, the Court will briefly address the few issues that are unique to this Motion.

## II.   DISCUSSION

### A.   Plaintiffs Have Not Presented Any Evidence That They Are "Similarly Situated".

Whereas Defendants presented extensive evidence showing the wide variations in the Plaintiffs' claims, Plaintiffs have presented no evidence to support their conclusory assertion that they are similarly situated.  Plaintiffs simply state that deputy sheriffs "did not turn in overtime in accord with the practice and policies of the employer," Opp'n 9:11-14, but cite no depositions or other evidence substantiating this claim.  Plaintiffs have therefore failed to

3

1  satisfy their burden to provide substantial evidence that the class

2  members are similarly situated.  <u>Reed v. County of Orange</u>, 266 F.R.D.

3  446, 449 (C.D. Cal. 2010).  Decertification is thus proper on its

4  merits, and because Plaintiffs failed to present any evidence.

5  **B.   Defendants' Motion to Decertify is Not Untimely.**

6       Plaintiffs fault Defendants for not filing their Motion to

7  Decertify sooner, arguing that discovery as to the plaintiffs in this

8  case could have been completed within a few months after the action

9  was certified in 2008.  Plaintiffs imply that Defendants delayed

10  discovery in this case in order to gain some kind of tactical

11  advantage with respect to the much larger *Ascolese* case.

12       In response, Defendants recounted their discovery efforts

13  beginning in 2008.  <u>See</u> Reply 8:1-10:1.  Defendants attempted to

14  obtain discovery from seven Plaintiffs starting in 2008, but had to

15  file motions to compel when Plaintiffs failed to respond.  <u>Id.</u>

16  Thereafter, discovery was evidently halted when Plaintiffs' original

17  counsel withdrew and Plaintiffs had to find new counsel.  <u>Id.</u>  Then,

18  the parties engaged in hard-fought litigation before the magistrate

19  judge concerning how to conduct discovery as to the opt-in plaintiffs.

20  <u>Id.</u>  Finally, when Plaintiffs failed to comply with the Court's

21  discovery orders, Plaintiffs' counsel proposed that discovery be

22  coordinated with the *Ascolese* case, and the Court adopted this

23  suggestion.  <u>Id.</u>  These facts are borne out by the record.  It is not

24  clear to the Court when the discovery submitted for this motion was

25  complete, but it is clear that Defendants did not delay discovery or

26  improperly delay filing this Motion.  Plaintiffs' meritless timeliness

27  objection is therefore overruled.

28

C.   **Discovery in *Ascolese* and *Lockhart* was Coordinated; Plaintiffs'
     Objections to Defendants' Use of Evidence Pertaining to *Ascolese*
     Plaintiffs is therefore Overruled.**

Plaintiffs also object that Defendants rely primarily on evidence relating to *Ascolese* plaintiffs, and have not limited their presentation to evidence relating to *Lockhart* plaintiffs.  This objection is unavailing, however, because discovery in the cases was coordinated, at Plaintiffs' counsel's suggestion.  See Docket no. 495 5:7-11, 5:1-7:28.  Plaintiffs argued, for example, that because the plaintiffs in both cases have "almost identical claims," several plaintiffs have opted in to both cases, and the class definitions overlap extensively, "Lockhart plaintiffs believe that most, if not all, of the discovery conducted in either case will be relevant in both cases."  Id. and 5:4-9, 5:23-24.  Plaintiffs have failed to explain why these characterizations no longer apply and how additional evidence from exclusively *Lockhart* plaintiffs would materially differ from the evidence Defendants presented from both cases.  Defendants therefore properly presented evidence from *Ascolese* plaintiffs.

D.   **Decertification is a Well-Accepted Case Management Procedure.**

Plaintiffs suggest that seeking decertification is somehow improper or that decertification is a disfavored "discretionary procedural issue" that Defendants are abusing to obtain a tactical advantage.  Opp'n 1:23-3:4.

But, the two-step process for determining whether a collective action is appropriate is well-accepted in this circuit.  As discussed in many cases, in the first step, the court determines whether to conditionally certify the case; the standard is "lenient," the analysis is based primarily on affidavits and the pleadings, and its purpose is simply to determine whether other potential plaintiffs

5

1  should be given notice.  <u>Leuthold v. Destination America, Inc.</u>, 224

2  F.R.D. 462, 467 (N.D. Cal. 2004).  In the second step, the court

3  determines whether the case should remain certified; this more

4  rigorous analysis involves examining whether the opt-in plaintiffs are

5  in fact similarly situated, and is based upon a more fully developed

6  record, usually once significant discovery has taken place.  <u>Reed v.</u>

7  <u>County of Orange</u>, 266 F.R.D. 446, 449 (C.D. Cal. 2010).  Thus, the

8  Court is not persuaded by Plaintiffs' suggestion that by moving to

9  decertify Defendants are somehow invoking a disfavored or improper

10  procedure.  In fact, Defendants are simply following standard

11  procedure.

12  **E.   Plaintiffs' Remaining Arguments are Not On-Point.**

13       Plaintiffs present several additional legal arguments without

14  explaining what bearing they have on the issues relevant to

15  decertification.  For example, Plaintiffs briefly discuss law

16  pertaining to how to determine whether an employee is exempt from

17  overtime (Opp'n 5:1-11), and argue that employers cannot delegate to

18  employees the duty to keep time records (Opp'n 5:12-6:21).  However,

19  this case does not involve any dispute about classifying Plaintiffs as

20  exempt or non-exempt.  And, although this case does involve overtime

21  compensation – and necessarily reporting and recording of overtime –

22  Plaintiffs have not tied their argument to the issue central to this

23  motion: whether they are similarly situated such that this action may

24  proceed as a collective action.

25  //

26  //

27  //

28

### III.  CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Court's concurrently-issued order in related case *Ascolese v. County of Los Angeles*, CV 08-1267 ABC (CWx), which is incorporated herein by reference, the Court finds that the opt-in Plaintiffs are not in fact similarly situated to the named Plaintiffs with regard to their off-the-clock claims.  The Court therefore **GRANTS** Defendants' Motion to Decertify Collective Action, and decertifies the action.  The opt-in class members are hereby **DISMISSED WITHOUT PREJUDICE.**

The Court tolls the statute of limitations for 60 days from the date of this Order.  During this time, Plaintiffs will have an opportunity to pursue their individual claims.

**IT IS SO ORDERED.**

**DATED:**    _____ August 6, 2012 _____

_____
**AUDREY B. COLLINS**
**CHIEF UNITED STATES DISTRICT JUDGE**

# ATTACHMENT 1

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10                            WESTERN DIVISION

11

12   MICHAEL ASCOLESE, MARCELLO        *ED* CV 08-1267 ABC (CWx)
     CURKO, MARK ERBACKER, DEAN
13   GALARNEAU, GEORGE HOFSTETTER,          ORDER RE: DEFENDANTS' MOTION TO
     JAMES LARKIN, and MARK SALLES,         DECERTIFY COLLECTIVE ACTION
14   on behalf of themselves and all
     others similarly situated,
15
16                      Plaintiffs,
17
18              v.
19   COUNTY OF LOS ANGELES, and LEE
     BACA, *et al.*,
20
                        Defendants.
21

22        Pending before the Court is Defendants County of Los Angeles, et

23   al.'s ("Defendants" or "County") Motion to Decertify Collective Action

24   ("Motion"), filed on June 4, 2012.  Plaintiffs Michael Ascolese, et

25   al., filed an Opposition on June 11, 2012 and Defendants filed a Reply

26   on July 20, 2012.  The parties also submitted evidence including

27   declarations, deposition testimony, and discovery materials to support

28

their positions.[1]  The Court heard oral argument on August 6, 2012.
For the reasons below, the Court **GRANTS** Defendants' Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In this lawsuit, Plaintiffs, deputy sheriffs employed by the Los
Angeles County Sheriff's Department ("LASD"), claim that Defendants
failed to compensate them for various pre-shift and post-shift
activities in violation of the Fair Labor Standards Act ("FLSA"), 29
U.S.C. §§ 201 *et seq.*.  These activities can be divided into two
categories: (1) donning and doffing uniforms and related equipment,
and (2) all other "off-the-clock" activities, such as participating in
"pass-on" briefs by deputies going off-shift, preparing and inspecting
patrol cars and equipment, attending briefing, checking in, checking
email, completing paperwork, completing late arrests, doing security
checks of courtrooms and jails, and a number of other tasks.  The
parties and the Court have referred to the resulting claims as donning
and doffing claims and off-the-clock ("OTC") claims, respectively.[2]

On August 5, 2010 and on February 7, 2011, pursuant to the "two-
step analysis" governing collective action certification, the Court
found that Plaintiffs made the threshold showing that the potential
members of the §216(b) collective action were "similarly situated" to
the named Plaintiffs and conditionally certified the donning and

---

[1]  Defendants submitted with their moving papers an Appendix
of Evidence consisting Exhibits 1 through 58, and a Reply
Appendix consisting of Exhibits 59 through 80.  The Court will
simply refer to Plaintiffs' exhibits as "Exh. __ ."  Plaintiffs
submitted 10 exhibits attached to the Goyette Declaration; the
Court will refer to these as "Pls.' Exh. __ ."

[2]  Plaintiffs also alleged a compensatory time off claim,
but have never sought certification of that claim.

2

1  doffing and OTC claims.  Since then, approximately 3,000 persons have

2  opted-in to this action.

3      On June 14, 2012, the Court granted summary judgment for

4  Defendants against Plaintiffs' donning and doffing claim.  As such,

5  the only remaining conditionally certified claims are Plaintiffs' off-

6  the-clock claims.

7      Defendants now ask the Court to undertake the more stringent

8  second step of the certification analysis and decertify this action.

9  Defendants contend that discovery obtained to date shows that

10  Plaintiffs' OTC claims are too disparate to lend themselves to

11  resolution in a collective action.

12      Plaintiffs filed a limited six page opposition.  First, they

13  object to the Motion on two procedural grounds: that their own Rule

14  41(a)(2) Motion to Dismiss should be granted instead, and that

15  discovery is not closed so the Court has insufficient information to

16  perform the second stage analysis.  Substantively, Plaintiffs argue

17  that when the class members are grouped into subclasses they identify

18  as the patrol, custody, and court subclasses, the discovery taken to

19  date demonstrates that the opt-in class members are similarly situated

20  to the named plaintiffs.  Notably, although Plaintiffs state that pre-

21  and post-shift activities are consistent within these subclasses, the

22  only activities Plaintiffs actually mention in their brief are pre-

23  shift activities.  The Court therefore deems Plaintiff to have

24  conceded that certification is not appropriate for any class members

25  not in the three subclasses, or for post-shift activities.

26

27

28

## II.  ANALYSIS

### A.  Legal Standard for a §216(b) Motion

The FLSA requires covered employers to compensate non-exempt employees for time worked in excess of statutorily-defined maximum hours.  See 29 U.S.C. §207(a).  Section 16(b) of the FLSA provides that an employee may bring a collective action on behalf of himself and other "similarly situated" employees.  29 U.S.C. § 216(b).

In a §216(b) collective action, employees wishing to join the suit must "opt-in" by filing a written consent with the court.  If an employee does not file a written consent, then that employee is not bound by the outcome of the collective action.  Leuthold v. Destination America, Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004).  The court may authorize the named §216(b) plaintiffs to send notice to all potential plaintiffs, and may set a deadline for those plaintiffs to "opt-in" to the suit.  Id.; see also Pfohl v. Farmers Ins. Group., 2004 WL 554834 at *2 (C.D. Cal. 2004).

It is within the discretion of the district court to determine whether certification of a §216(b) collective action is appropriate.  Leuthold, 224 F.R.D. at 466.  Although the FLSA does not require certification for collective actions, certification in a §216(b) collective action is an effective case management tool, allowing the court to control the notice procedure, the definition of the class, the cut-off date for opting-in, and the orderly joinder of the parties.  See Hoffmann-La Roche Inc., v. Sperling, 493 U.S. 165, 170-72 (1989).

Most courts have applied a two-step approach to determine whether certification of a §216(b) collective action is appropriate.  See Leuthold, 224 F.R.D. at 466.  Under the two-step approach, the first

4

1   step is for the court to decide, "based primarily on the pleadings and

2   any affidavits submitted by the parties, whether the potential class

3   should be given notice of the action." Id. at 467; see also Pfohl,

4   2004 WL 554834 at *2.  Given the limited amount of evidence generally

5   available to the court at this stage in the proceedings, this

6   determination is usually made "under a fairly lenient standard and

7   typically results in conditional class certification." Id.  This step

8   has already taken place in this case.

9        Now at issue is the second step, which occurs when a significant

10  amount of discovery has occurred and the case is nearing readiness for

11  trial.  The purpose of this analysis is to determine with the benefit

12  of a more fully developed record whether the plaintiffs are "similarly

13  situated" so as to justify proceeding as a collective action.  Reed v.

14  County of Orange, 266 F.R.D. 446, 449 (C.D. Cal. 2010) (citing

15  Leuthold, 224 F.R.D. at 466-467, and Smith v. T-Mobile USA, Inc., ("T-

16  Mobile") 2007 WL 2385131, at *7 (C.D. Cal. 2007).  The FLSA does not

17  define the term "similarly situated," and there is no Ninth Circuit

18  precedent interpreting the term.  Adams v. Inter-Con Sec. Sys., Inc.,

19  242 F.R.D. 530, 536 (N.D. Cal. 2007); see also Thiessen v. Gen. Elec.

20  Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001) ("Unfortunately,

21  [Section] 216(b) does not define the term 'similarly situated' and

22  there is little circuit law on the subject.")

23       However, in most courts, including this one, whether to decertify

24  is a factual determination based on the following factors: "(1) the

25  disparate factual and employment settings of the individual

26  plaintiffs; (2) the various defenses available to the defendants with

27  respect to the individual plaintiffs; and (3) fairness and procedural

28  considerations." Reed, 266 F.R.D at 449-450 (citation omitted).  If

after examining the factual record the court determines that the plaintiffs are not similarly situated, then the court may decertify the collective action and dismiss the opt-in plaintiffs without prejudice.  T-Mobile, 2007 WL 2385131, at *4 (citing Kane v. Gage Merchandising Svcs., Inc., 138 F. Supp. 2d 212, 214 (D. Mass. 2001). These factors help the court ascertain whether collective treatment is appropriate as "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action."  Anderson v. Cagle's Inc., 488 F.3d 945, 953 (11th Cir. 2007).  Although the defendant is the moving party, it is the plaintiff's burden to provide substantial evidence that the class members are similarly situated.  Reed, 266 F.R.D. at 449.

**B.   The Court Overrules Plaintiffs' Procedural Objections.**

    **1.   Discovery To Date is Sufficient to Inform the Second Step.**

Plaintiffs argue that the discovery conducted to date is insufficient to support engaging in the second step now.  Plaintiffs point out that depositions of some randomly selected class members and department commanders have not been completed, and that Plaintiffs have not inspected the premises at each LASD station.  Opp'n 2:12-17. However, Defendants identify the substantial discovery that has been conducted: Defendants have responded to Plaintiffs' 48 interrogatories and 71 document requests; Plaintiffs have deposed a number of County witnesses including Rule 30(b)(6) witnesses regarding overtime and timekeeping policies and procedures; and 17 of the 60 representative sample depositions have been completed.  Sheldon Decl.[3] ¶¶ 15-16, 7-13.  Defendants contend that on April 19, 2012, Plaintiffs

---

[3]   The Sheldon Declaration appears after Exhibit 4 in Defendants' Appendix of Evidence, part 1.

unilaterally cancelled the remaining depositions, id. at ¶¶ 7-14, including depositions scheduled for the end of April and May 2012, and that Plaintiffs have never sought to inspect LASD premises.

Having reviewed all of the discovery materials presented, the Court finds that it provides sufficient evidence for step two review. The most relevant outstanding discovery would likely be the plaintiffs' depositions, but Plaintiffs do not specify what they hope to glean from those remaining depositions that has not already been discovered.  The depositions submitted appear to present a rather complete view of the nature of the claims involved.  Furthermore, Plaintiffs themselves cancelled these depositions.  As such, the Court overrules Plaintiffs' objection that the Motion is premature.

**2. Plaintiffs' Rule 41(a)(2) Motion and the Instant Motion Are Not Interchangeable.**

The Court also rejects Plaintiffs' invitation to simply grant their Rule 41(a)(2) motion to dismiss instead of ruling on this Motion because, they claim, it would result in the same situation: the dismissal of the opt-in plaintiffs.

First, in a concurrently-issued order, the Court is denying Plaintiffs' Rule 41(a)(2) motion.  But setting that aside, were the relief requested in the two competing motions truly the same, then Plaintiff could have simply filed a non-opposition to Defendants' decertification motion.  Plaintiffs did not do so, presumably for the obvious reason that the opt-in plaintiffs would be differently-situated upon the grant of this motion: if the Court grants the motion to decertify, even though the opt-in plaintiffs would be dismissed without prejudice and could pursue claims individually, the order may have collateral estoppel effect and it is less likely that those same

plaintiffs will attempt to bring another collective action asserting the same claims.  If the Court grants the Rule 41(a)(2) motion to dismiss and does not rule on the motion to decertify, then the whole collective action process could begin again in a different case, and this entire litigation would have been for naught.  It appears that the plaintiffs in Reed v. County of Orange, USDC Case no. SACV 05-1103 CJC (ANx) tried to make an "end-run" around the decertification order there by filing a new case, Weaver v. county of Orange, USDC Case no. SACV 10-00101 CJC (ANx), with the same 677 plaintiffs named individually.  But the existence of its decertification order enabled the court to consider the effect of its own order and dismiss the mis-joined plaintiffs.  See Reply p. 2, fn. 1; Defs' Request for Judicial Notice.   Ruling on the decertification motion now instead of simply dismissing the case may similarly assist the Court and the parties in moving forward expeditiously.

Because the evidence presented is sufficient to rule on the motion to decertify, the Court will do so notwithstanding Plaintiffs' Rule 41(a)(2) motion.

**C.   Analysis**

**1.   Plaintiffs' Factual and Employment Settings**

The Court must examine the Plaintiffs' factual allegations and employment settings to determine how similarly situated they really are.  Where plaintiffs are subject to varying work conditions in different locations or under different supervisors, they are less likely to be similarly situated and decertification is appropriate. See Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 282 (N.D. Tex. 2008).  Whether the plaintiffs' claims arise out of a single policy, custom, or practice is also considered under this

element.  See T-Mobile, 2007 WL 2385131, at *7 (C.D. Cal. 2007).

Plaintiffs have not shown the existence of a policy that could unify their claims.  LASD's official overtime policy requires deputies to truthfully and accurately report all the time they spend performing job duties.  Nelson Decl. ¶ 27.  Deputies are required to get pre-approval for overtime, and they are required to report all overtime, whether or not it was pre-approved.  Id.  Although some Plaintiffs testified at their depositions that Defendants have an unwritten policy that discourages them from claiming overtime, Plaintiffs have not pursued this argument in their opposition and thus have not demonstrated that their claims arise out of a single policy, custom, or practice.  In short, Plaintiffs have failed to argue, let alone demonstrate, the existence of a common policy or practice that gave rise to their claims.  Indeed, the deposition testimony does not support the existence of a single policy, as some deputies testified that certain supervisors were just not happy to sign overtime sheets, and that others actively encouraged deputies to report all overtime.  See, e.g., Erbacker Depo. 127:10-18 (Exh. 10) (stating supervisors in Long Beach have signed overtime reports but "with reservations"); Salles Depo. 129:5-24 (Exh. 24) (describing that whether you submit an overtime report "depends on which commander was there"); Ruiz Depo. 156:11-19 (Exh. 19) (stating that if a supervisor saw him working past his shift, he would have Ruiz "either put in a save slip or have [him] adjust [his] hours.").  Such testimony does not come close to proving a single policy or custom.

The other facets of Plaintiffs' factual allegations and employment settings vary widely.  This can be inferred from a review of the LASD's structure.  The LASD exmploys approximately 10,000 sworn

9

1   personnel.  Nelson Decl. ¶ 6.  The LASD is organized into 10 Divisions

2   consisting of three Field Operations Divisions (in Regions I, II, and

3   III), the Court Services Division, the Custody Division, the Detective

4   Division, the Homeland Security Division, the Leadership and Training

5   Division, the Technical Services Division, and the Administrative

6   Services Devision.  Id.  These divisions are further subdivided into

7   Bureaus, Units, and Sub-Units.  Id. ¶¶ 6-22.  Within these

8   subdivisions, there are dozens of different job assignments with

9   different duties and approximately 180 different work locations.  Id.

10  ¶¶ 6-28.  Employees therefore necessarily work in different locations,

11  under different conditions, and under many different direct

12  supervisors who may or may not have affected whether employees claimed

13  overtime.  See Mot. 16:24-17:25 (based on deposition and discovery

14  responses, identifying numerous supervisors for each of 10

15  plaintiffs).  Even at the same work location, employees work under

16  different supervisors depending on the day of the week or other

17  factors.  See, e.g., Curko Dep. 42:19-44:17 (Exh. 12) (supervisors

18  vary day to day even in same location); Medina Depo. 156:5-25 (Exh.

19  18) (identifying six different supervisors while he worked as a court

20  deputy in two different locations between December 2008 and December

21  2009).

22      Perhaps due to this diversity of circumstances within the entire

23  LASD, Plaintiffs propose to maintain certification of only three

24  subclasses.  But, even among the three proposed subclasses, there is

25  great variety among plaintiffs' OTC claims.

26          a.   Patrol Subclass

27      Plaintiffs assert that all members of the patrol subclass "must

28  perform a multiplicity of pre-briefing tasks" before their respective

shifts, including (1) locate their patrol vehicle; (2) fuel up the vehicle; (3) engage in a "pass-on" briefing with the outgoing patrol deputy to obtain information; (4) check out their shotgun, (5) their taser, (6) their radio, and (7) their "war bag" and (8) place all of this equipment in their patrol vehicles; and (9) log on to their MDT terminal in the vehicle to connect to dispatch. Opp'n 5:3-11. But the evidence in the record does not support Plaintiffs' assertion that all patrol deputies engage in these pre-briefing tasks.

For example, Plaintiffs cite deposition testimony of three deputies – Adrian Guillen, Israel Sanchez, and Raymundo Castaneda – for the proposition that all patrol deputies perform all of these pre-shift tasks. See Goyette Decl. ¶ 5. However, Guillen's cited testimony makes no reference to engaging in pass-on briefing with the outgoing deputy (Pls.' Exh. 1); Sanchez's testimony identifying certain pre-shift activities refers to when he was a custody deputy at Pitchess Detention Facility-North (Sanchez Depo. 26:14-18 (Pls.' Exh. 2)), not a patrol deputy, and doesn't mention any of these pre-shift activities; and Castaneda's reference to a briefing to obtain pass-on information pertained to his time as a watch deputy, not a patrol deputy (Castaneda Decl. 53:4-15 (Pls.' Exh. 3), 15:18-21 (Exh. 66)). These depositions are the only evidence Plaintiffs present to show that all patrol deputies perform all of the tasks identified above. Because the evidence does not support that conclusion, Plaintiffs have not demonstrated that these pre-shift tasks are performed by all patrol deputies.

Other deposition testimony also shows that not all patrol deputies perform all of these tasks. For example, plaintiff George Hofstetter, a patrol motorcycle deputy, testified that he does not

engage in a pass-on briefing with outgoing deputies because he goes straight into the field at the start of his shift instead of reporting in person to the patrol station. Hofstetter Depo. 38:21-39:16 (Exh. 67). Nor did plaintiffs Kary Brandy or Kevin Nelson identify such briefings among their pre-shift tasks. Bandy's Interrogatory Resp. 5:3-14 (Exh. 39); Nelson Depo. 5:3-14 (Exh. 69). Similarly, some plaintiffs testified that they prepared their vehicles on shift, or partially on shift, and did not prepare their vehicles prior to their shifts, or did so only sometimes. See, e.g., Curko Depo. 63:6-15 (Exh. 12) ("[n]ormally you would [get patrol car ready] after briefing"); Larkin Depo. 189:19-190:8 (Exh. 34) (getting vehicle ready happens partially off-the-clock, partially on-the-clock); Salles Depo. 70:10-21 (Exh. 72) (did not have to prepare vehicle prior to shift); Castaneda Depo. 98:6-21, 104:25-105:18 (Exh. 66) (as deputy generalist, prepares vehicle before shift; but in four other assignments – some of which seem to be in the patrol subclass – is making claim only for donning and doffing and not preparing vehicle).

In addition, some deputies testified to performing tasks not included in Plaintiffs' list or that other deputies did not claim to do. For example, Plaintiff Casteneda testified to needing to prepare paperwork (Casteneda Depo. 150:9-21 (Pls.' Exh. 3)), Plaintiff Bandy identified raising the station flag as one of her pre-shift duties (Bandy's Interrogatory Resp. 5:3-14 (Exh. 39)), and plaintiff Nelson stated that while he was a watch commander in Compton, he sometimes answered telephones, drew maps on dry erase boards, checked his mailbox, and counted the cash box, all before his shift. (Nelson Depo. 81:4-84:25 (Exh. 69).) Given all of these variations among patrol deputies, the Court cannot conclude that the patrol deputies

performed all of the same pre-shift tasks consistently enough to render them similarly situated.

### b.   Custody Subclass

Plaintiffs also contend that all custody deputies perform certain pre-shift activities, including checking gear, signing in, walking to assignments, and making reliefs. Mot. 5:15-22.  In support of this proposition, Plaintiffs cited deposition testimony of Tjay McKelvey (Pls.' Exh. 4) and Alan Wynkoop (Pls.' Exh. 5).

However, other portions of these depositions show that these plaintiffs' pre-shift activities varied.  For example, McKelvey testified that for his first year and a half, he had certain pre-shift responsibilities relating to "ERT" and "FRT" equipment[4], and that for his first three months he started doing these tasks 45 minutes early. McKelvey Depo. 25:17-25, 63:1-65:18 (Exh. 70).  These tasks depended on whether he was assigned to ERT or FRT during this first year and a half, and whether he had those assignments sometimes depended on who the supervisor was.  Id. at 64:8-65:18.  Wynkoop testified that his pre-shift activities included moving inmates from various locations such as a hospital, and preparing a vehicle for the shift.  Wynkoop Depo. 43:12-17, 121:17-21, 130:3-5 (Pls.' Exh. 5).  This is not an activity that Wynkoop always did, and, according to Plaintiffs, was not among the activities typical of custody deputies.

Among the custody deputies, the assignments are sufficiently varied that they defy common treatment.  Plaintiff Ibarra, for example, testified that as a member of a Transition Team for the

---

[4]   The deposition does not specify what "ERT" and "FRT" mean, but from the context, they appear to relate to emergency response, and these acronyms may refer to emergency or fire response teams.

13

1    CRDF[5], she had no pre-shift activities except donning and doffing her

2    uniform when she had to wear one.  Ibarra Depo. 59:11-60:2 (Exh. 71).

3    However, as a Training Deputy, Ibarra's pre-shift activities included

4    donning and doffing; retrieving the in-service sheet, a radio, and

5    keys; and occasionally setting up a classroom.  Id. at 64:1-11, 65:9-

6    67:16.

7         Based on the foregoing, Plaintiffs have not shown that custody

8    deputies' pre-shift activities are sufficiently similar to warrant

9    collective treatment.

10             c.   **Court Deputy Subclass**

11        Finally, Plaintiffs contend that members of the court deputy

12   subclass all performed the same pre-shift activities, specifically,

13   logging in, checking emails, and performing sweeps of areas

14   surrounding assigned courtrooms.  Opp'n 5:23-6:2.  Once again,

15   however, while Plaintiffs have identified some court deputies who

16   performed these duties, the evidence that they cite shows that not all

17   court deputies performed these duties.  For example, neither Plaintiff

18   Oates nor Plaintiff Hyland referred to "performing sweeps of areas

19   surrounding assigned courtrooms."  Rather, Oates testified that he

20   occasionally checked **the courtroom** and that he did it **during** his shift

21   (Oates Depo. 70:10-21 (Pls.' Exh. 6)); Hyland testified that she did

22   not check her assigned courtroom before her shift because she didn't

23   have time to.  (Hyland Depo. 42:13-23 (Pls.' Exh. 7)).

24        Furthermore, while it appears that the duties Plaintiffs

25   identified were often performed by deputies serving as courtroom

26   bailiffs, there are other assignments within the court deputy class

27   _____

28        [5]  Presumably, the Century Regional Detention Facility in
     Lynwood.

                                    14

that do not include the same tasks, such as lockup deputies and
security bailiffs.  For example, a lockup deputy's primary job duty is
to monitor detainees scheduled to appear in court.  Erbacker Depo.
21:20-22-3, 22:12-23:8 (Exh. 61.)  Plaintiffs Erbacker and Olmos
testified that their pre-shift activities as lockup deputies included
checking inmate holding cells, opening the gate, and sometimes
retrieving the radios and keys if they were not already available.
Erbacker Depo. 117:12-119:7 (Exh. 61), Olmos Depo. 67:6-24 (Exh. 65).
Erbacker testified that sometimes he checked the cells before his
shift, and sometimes he did it while on duty; it depended on when he
happened to arrive to work.  Erbacker Depo. 117:12-119:7 (Exh. 61).
As lockup deputies, Erbacker and Olmos did not, evidently, perform any
of the three tasks Plaintiffs claim all court deputies performed.
Erbacker also testified that, when he was a security bailiff, his main
job was to "roam[] the halls, the public halls and keeping order,
assisting other bailiffs."  Id. 21:4-9.  Erbacker also served as both
a courtroom bailiff and a security bailiff, and these assignments
involved different preshift tasks.  For example, as a courtroom
bailiff, Erbacker would inspect the judge's chambers and search the
courtrooms for weapons; as a security bailiff, he would do courtroom
checks only as a back-up to the courtroom bailiff.  Id. 128:1-12,
131:6-132:10.

These are just examples of the variations in the pre-shift tasks
performed by court deputies, but they suffice to demonstrate that
their claims for uncompensated pre-shift work are not substantially
similar.

//

**2.   Defendants' Defenses**

Whether the Defendants' defenses are individualized or applicable to all plaintiffs also informs whether the Plaintiffs are similarly situated.  The defenses at issue here – that management had no knowledge of uncompensated overtime, that some OTC activities are not compensable "work," and that some OTC work falls within the FLSA's de minimis exception – clearly require individualized inquiries.  Indeed, Plaintiffs' opposition does not even address the applicability of Defendants' defenses.

For example, "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the [FLSA]." <u>Forrester v. Roth's I.G.A. Foodliner, Inc.</u>, 646 F.2d 413, 414 (9th Cir. 1981).  Surely Plaintiffs will assert that management knew of their uncompensated overtime.  Defendants will want to rebut that allegation, and clearly can only do so by individualized inquiry.  The deposition excerpts presented are replete with conflicts concerning whether supervisors knew or should have known deputies were working uncompensated overtime.  For example, Plaintiff Ascolese testified that all of his supervisors know that he checks his email prior to his shift without compensation (Ascolese Depo. 86:16-88:11 (Exh. 9)), but one of Ascolese's supervisors, Lt. Greenberg, testified that he did not know that any deputy under his supervision checked his email early.  Greenberg Depo. 36:24-37:19 (Exh. 16).  It is also plain that whether Plaintiffs' uncompensated time was spent on compensable "work" or whether the de minimis exception applies are also by their nature

individualized inquiries.

### 3.   Fairness and Procedural Considerations

"In evaluating fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." Reed v. County of Orange, 266 F.R.D. 446, 462 (C.D. Cal. 2010) (citation omitted). A corrolary to this second consideration is whether the court "can coherently manage the class in a manner that will not prejudice any party." Id. (citation omitted).

Arguably, a collective proceeding may minimize the Plaintiffs' costs. However, considering the absence of a policy from which Plaintiffs' claims arose, and that the Plaintiffs have widely varying experiences with claiming overtime, the Court is convinced that allowing this case to continue as a collective action would not be fair to either side, and would yield no meaningful efficiencies. Because all of the claims and defenses turn on individualized inquiries, nothing can be decided collectively, and the purposes of treating this as a collective action would be thwarted.

For example, to resolve even one plaintiff's claim, the parties would have to isolate exactly what job assignments that plaintiff had throughout the statutory period. This is not a simple task, as throughout the statutory period, many deputies worked in different divisions, at different locations, and under different supervisors. Indeed, as noted above, many deputies had multiple supervisors even in the same job location. The fact-finder would have to hear testimony about what OTC duties that deputy performed, then defense testimony

17

about each supervisors' good faith, the compensability of the "work," and whether the time spent was de minimis.  This process would have to occur for each plaintiff, that is, about three thousand times, resulting in three thousand mini-trials.

It is self-evident that such a proceeding would achieve no efficiencies.  Plaintiffs propose no case management plan to mitigate these difficulties, and Court discerns none; instead, "[p]roceeding collectively in this case would, in short, be unmanageable, chaotic and counterproductive."  Reed, 266 F.R.D. at 462 (C.D. Cal. 2010).

### III.  CONCLUSION

Based on the foregoing, the Court finds that the opt-in Plaintiffs are not in fact similarly situated to the named Plaintiffs with regard to their off-the-clock claims.  The Court therefore **GRANTS** Defendants' Motion to Decertify Collective Action, and decertifies the action.  The opt-in class members are hereby **DISMISSED WITHOUT PREJUDICE**.  At Plaintiffs' request, the named Plaintiffs are also **DISMISSED WITHOUT PREJUDICE**.

The Court tolls the statute of limitations for 60 days from the date of this Order.  During this time, Plaintiffs will have an opportunity to pursue their individual claims.

IT IS SO ORDERED.

DATED:  _____ August 6, 2012_

_____
**AUDREY B. COLLINS**
**CHIEF UNITED STATES DISTRICT JUDGE**